UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

TIMOTHY POPPENS,

    Plaintiff,

    v.                                                          Case No. 1:23-CV-258-CCB

WELLS FARGO CLEARING SERVICES,
LLC,

    Defendant.

## OPINION AND ORDER

Before the Court is Defendant Wells Fargo Clearing Services, LLC's ("Wells

Fargo") Motion for Summary Judgment. (ECF 54). Plaintiff Timothy Poppens opposes

this motion. (ECF 63). The Court grants Wells Fargo's motions for the reasons below.

### I.      RELEVANT BACKGROUND

This is an employment discrimination and defamation case. Mr. Poppens alleges

that his former employer, Wells Fargo, illegally discriminated against him based on his

age and race. He also raises a state-law claim that Wells Fargo defamed him. The Court

summarizes the undisputed facts below.

Mr. Poppens is a white man born in 1958. (ECF 36 at 2; ECF 55-9 ¶ 5). He began

his financial services career with Merrill Lynch in 1983 and went on to work for several

other financial services companies. (ECF 65-2 ¶¶ 7–12). In 2015, he was promoted to the

position of Wells Fargo Market Leader for the Northern Indiana Market. (ECF 65-2

¶ 13). He served concurrently as the Branch Manager of Wells Fargo's Fort Wayne, Indiana, branch ("the Branch"). (ECF 55-1 at 63:15–19).

Initially, all employees at the Branch, including Financial Advisors ("FAs"), Client Assistants ("CAs") and other operations staff reported to Mr. Poppens. (ECF 65-2 ¶ 19). But this reporting structure changed over time. The parties dispute precisely when the shift occurred, but by some point in 2019, only the FAs at the Branch reported directly to Mr. Poppens. (ECF 65-2 ¶ 20). The other employees reported up through the operations side of the Branch. (*Id.*) This reporting structure lasted until some point in 2022. (*Id.*; ECF 55-7 at 21–22).

While serving as Northern Indiana Market Leader, Mr. Poppens received regular performance evaluations. (ECF 55-1 at 81:5–8). In 2018, Wells Fargo hired Robert Samson as Midwest Regional Director. (ECF 55-1 at 50:1–24). Mr. Samson was Mr. Poppens's direct supervisor and conducted Mr. Poppens's 2018 performance evaluation. (ECF 55-1 at 83:8–84:7; ECF 65-2 ¶ 22). In his written evaluation of Mr. Poppens's performance, Mr. Samson stated that Mr. Poppens "had a tough year [from] a metrics standpoint," but that he was "confident Tim will bounce back in 2019." (ECF 55-2 at 43). Mr. Samson's feedback on the 2018 review form showed that Mr. Poppens was "on track." (ECF 65-2 ¶ 28).

Mr. Samson also conducted Mr. Poppens's 2019 performance review. (ECF 65-2 ¶ 31). Mr. Samson assessed Mr. Poppens based on four weighted performance criteria and gave him one grade of "Exceeds," one grade of "Meets," and two grades of

2

"Improvement Needed." (ECF 65-2 ¶ 117; ECF 55-2 at 46–50). Overall, Mr. Samson rated Mr. Poppens as "Performing." (ECF 55-2 at 46).

Mr. Poppens's 2020 performance review was again conducted by Mr. Samson. (ECF 65-2 ¶ 34). This performance review consisted of five unweighted criteria. (*Id.* ¶ 119). Mr. Samson gave Mr. Poppens three grades of "Meets," one grade of "Needs Improvement," and one grade of "Inconsistently Meets." (ECF 55-2 at 51–54). Overall, he assigned Mr. Poppens a grade of "Inconsistently Meets." (ECF 55-2 at 51).

In March 2021, Wells Fargo hired Kent Caldwell-Meeks, a Black man born in 1964, as the Midwest Division Senior Managing Director for Wealth & Investment. (ECF 65-2 ¶ 40). Mr. Poppens began directly reporting to Mr. Caldwell-Meeks, (*id.*), and Mr. Caldwell-Meeks gave Mr. Poppens his 2021 Midyear Performance Evaluation, (*id.* ¶ 44). On that evaluation, Mr. Poppens received an overall performance grade of "Meets." (ECF 55-2 at 55). Mr. Caldwell-Meeks also gave Mr. Poppens his 2021 Year-end Performance Review. (ECF 55-2 at 60). He graded Mr. Poppens as "Inconsistently Meets" overall. (*Id.*)

### a. The Market Leader Job

During 2021, Mr. Caldwell-Meeks made the decision to combine the two Indiana market groups into one larger market under a single Market Leader based in Indianapolis. (ECF 55-5 at 23:16–22, 27:16–20). Though the parties dispute the details of how and when Mr. Poppens found out about the merger, they agree that at some point in 2021, Mr. Poppens learned that the markets would be merged and that a new Indiana Market Leader position would be created. (ECF 55-1 at 68:17–69:2).

The job was posted in January 2022. (ECF 55-9 at 43–45, 47–48). Several internal and external candidates applied for the new Indiana Market Leader position. (ECF 55-9 at 50). The parties do not dispute that Mr. Poppens did not apply for the role, though they dispute the reasons why he did not apply. (ECF 55-1 at 98:13–15).

On February 24, 2022, Mr. Caldwell-Meeks informed Mr. Poppens that Mr. Poppens's position as Northern Indiana Market Leader was being eliminated due to the merger of the two Indiana markets. (ECF 55-1 at 227:4–10). Mr. Caldwell-Meeks announced that Joel Coleman, a Black man born in 1967, had been selected for the combined leadership position. (ECF 55-9 at 58–59). On February 28, 2022, Mr. Poppens emailed Andrew Ruehl, another Wells Fargo employee, and informed him that as of February 25, 2022, Mr. Poppens was transitioning into the Fort Wayne Branch Manager role. (ECF 55-9 at 61). That Branch Manager role changed Mr. Poppens's duties and title, but his salary remained the same. (ECF 55-1 at 113:20–25, 114:1–5).

### b. The Investigations

On or about February 8, 2022, Brokerage Field Support Associate Manager Amanda Scheele brought concerns to Employee Relations ("ER") about a Financial Advisor referred to as G.W. [1] (ECF 55-9 at 64). G.W. was one of Mr. Poppens's direct reports. (*Id.*) Wells Fargo's special investigation division, Enterprise Investigations

---

[1] Wells Fargo refers to this person as G.W. (*See* ECF 64 ¶ 35). Mr. Poppens refers to him as Scott Wray or Mr. Wray. (*See* ECF 65-2 ¶ 63). Though they use different identifiers, both parties respond to the other party's Statement of Material Fact in a way that shows they agree G.W. and Scott Wray are the same person. (*See, e.g.*, ECF 64 ¶ 35; ECF 69 ¶ 214). Thus, the Court will treat G.W. and Scott Wray as the same person.

("EI"), opened an investigation into the concerns raised by Ms. Scheele and assigned EI Investigator Andrew Kramer to the matter. (ECF 55-9 at 64).

Mr. Kramer interviewed Mr. Poppens about allegations that G.W. brought weapons into the workplace. (ECF 55-1 at 121:12–25, 122:1–6). He also asked Mr. Poppens some questions about Mr. Poppens's interest in buying G.W.'s book of business. (ECF 65-2 ¶ 109). Mr. Poppens told Mr. Kramer that sometime during October 2021 Mr. Poppens approached G.W., an FA in the Branch at the time, about buying G.W.'s book of business. (ECF 55-1 at 139:3–22). Ultimately, Mr. Kramer's investigation substantiated the allegations that G.W. brought weapons into the workplace, including a taser and firearm, and made threatening comments to other employees. (ECF 55-9 at 64–81). G.W. was terminated on February 25, 2022. (ECF 55-9 at 4).

After G.W.'s termination, G.W. called Mr. Poppens and asked if he could get his personal belongings from the Fort Wayne Branch. (ECF 65-2 ¶ 120). Mr. Poppens permitted G.W. to come into the Branch on a Sunday when no employees or clients were present. (*Id.* ¶ 121). G.W. came into the branch on Sunday, February 27, 2022, and packed up his personal belongings while Mr. Poppens supervised him. (*Id.* ¶ 221). Mr. Poppens later informed Mr. Caldwell-Meeks of this. (*Id.* ¶ 126).

The parties dispute many details of what followed, but they do not dispute that at some point Mr. Kramer opened an investigation into Mr. Poppens based in part on his relationship with G.W. (ECF 64 ¶ 38). Sometime during the week of February 28, 2022, Mr. Kramer called Mr. Poppens again and asked more questions about G.W. and about morale at the Branch since G.W.'s termination. (*Id.* ¶ 130). He asked Mr. Poppens

to keep the call confidential, and did not tell Mr. Poppens that Mr. Poppens was under investigation. (*Id.* ¶¶ 135–136). Mr. Poppens was terminated on May 24, 2022. (ECF 65-2 at 139–142).

Following his termination, Mr. Poppens filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 16, 2022. (ECF 65-2 ¶ 160). During the EEOC process, Wells Fargo submitted a position statement stating that Mr. Poppens was terminated for (1) illicitly disclosing details concerning a confidential HR investigation into a direct report and (2) failing to discipline a direct report and stop harassment. (ECF 65-9 ¶¶ 2–3).

### c. The U-5 Form

When a financial advisor leaves an employer, whether voluntarily or involuntarily, the former employer submits a Form U-5 to the Financial Industry Regulatory Authority ("FINRA"). (ECF 65-2 ¶ 308). Prospective employers who are members of FINRA may access this information. (ECF 65-2 ¶ 153). Mr. Coleman filled out the Form U-5 regarding Mr. Poppens. (ECF 65-5 at 131:17–22). The language for the form came from Employee Relations. (*Id.* at 131:1–17). The Form U-5 read as follows:

> Discharged after not meeting expectations in connection with managerial oversight in relation to the conduct of a direct report and in relation to interactions and communications with others. Not compliance or sales practice related.

(ECF 55-9 at 102).

### d. Mr. Palonis and Mr. Berg

On August 21, 2022, Mr. Coleman terminated Byran Palonis, the Branch Manager at the Merrillville, Indiana, branch. (ECF 65-8 ¶ 14). Mr. Palonis is a white man, and at the time of his termination he was 61 years old. (*Id.* ¶¶ 2, 15). After his termination, he filed a Charge of Discrimination with the EEOC, alleging Wells Fargo discriminated against him based on his race and age. (*Id.* ¶ 15). He also filed a Statement of Claims with FINRA, alleging discrimination on the same basis. (*Id.* ¶ 17). Finally, he made a claim for defamation based on the statements Wells Fargo made in a Form U-5. (*Id.*)

Gerry Berg was the Market Leader for the Southern Indiana Market when Mr. Poppens took the role of Market Leader for the Northern Indiana Market. (ECF 65–3 ¶ 5). Mr. Berg is a white man and was 69 years old when he retired from Wells Fargo. (*Id.* ¶¶ 2, 3, 20). While Mr. Berg was on medical leave, Mr. Coleman called him and informed him his position would also be eliminated due to the merger of the Northern and Southern Indiana Markets. (*Id.* ¶¶ 14–17). Any alternative positions with Wells Fargo would require Mr. Berg to move out of state, so he decided to retire. (*Id.* 19–20).

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477* U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). But the Court will not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor will the Court conduct research or develop arguments for the parties. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

To survive summary judgment, the nonmovant "cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

III.   ANALYSIS

Mr. Poppens alleges that Wells Fargo illegally discriminated against him based on his age in violation of the Age Discrimination in Employment Act ("ADEA") and

8

illegally discriminated against him based on race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). He also alleges that Wells Fargo illegally defamed him. Wells Fargo moves for summary judgment on each claim.

### a. Race Discrimination

Wells Fargo argues that it is entitled to summary judgment on Mr. Poppens's race discrimination claim because (1) there are no similarly situated employees who were treated differently than Mr. Poppens and (2) Wells Fargo had legitimate, non-discriminatory reasons for its decisions affecting Mr. Poppens's employment. Mr. Poppens responds that a reasonable jury could conclude he was discriminated against based on race because there is evidence that Wells Fargo's reasons for terminating Mr. Poppens were pretextual and because there is evidence in the record that suggests discriminatory intent.

In his complaint, Mr. Poppens details two events upon which his discrimination claims may rest: (1) Wells Fargo's failure to promote Mr. Poppens to the combined Indiana Market Leader position, and (2) Wells Fargo's termination of Mr. Poppens.

#### i. Failure to Promote

To proceed to trial on a discrimination claim based on a failure to promote, a plaintiff must "either produce sufficient direct or circumstantial evidence that [the employer's] promotion decisions were intentionally discriminatory or make an indirect case of discrimination under the burden-shifting method of *McDonnell Douglas*." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 891–92 (7th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792). In this context, the burden-shifting method requires that Mr.

Poppens first produce evidence of a prima facie case for failure to promote. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015). If he does so, the burden then shifts to Wells Fargo to produce evidence of "a legitimate nondiscriminatory reason for the employment action." *Id.* If Wells Fargo produces that evidence, the burden shifts back to Mr. Poppens to "produce evidence that [Wells Fargo's] 'stated reason is a pretext.'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802–04).

A prima facie case for failure to promote consists of evidence showing (1) Mr. Poppens was a member of a protected class; (2) he was qualified for the position he sought; (3) he was rejected for the position; and (4) the employer promoted someone outside the protected class who was not better qualified for the position. *Riley*, 829 F.3d at 892 (citing *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2008)). If Mr. Poppens fails to establish any of the elements of a prima facie case to promote, he cannot succeed under the *McDonnell Douglas* framework. *Id.*

Wells Fargo first argues that it is entitled to summary judgment on Mr. Poppens's claim that Wells Fargo discriminated against him based on race when it did not offer him the Indiana Market Leader position. In support, it points out that Mr. Poppens, by his own admission, never applied for the position. It also argues that Mr. Poppens cannot show that Mr. Coleman, who filled the position, was not better qualified. Mr. Poppens does not respond to these arguments, instead focusing solely on his termination in his response brief.

Wells Fargo's first argument is enough. Both parties agree that in 2021, Mr. Poppens became aware that a new Indiana Market Leader position would be created.

10

Both parties agree that the job was not posted until January 2022. And both parties agree that Mr. Poppens never applied. Mr. Poppens testified in his deposition that he believed he would be automatically considered for the position based on an informal Wells Fargo policy under which when two markets were merged, one of the two leaders of the former markets would be selected to lead the new market. (ECF 55-1 at 70:4–71:18). He also testified that he was informed of the merger in advance, but never reached out to Mr. Caldwell-Meeks, his direct supervisor, to ask about the position. (*Id.* at 230:5–231:22). And he testified that he was not sure he wanted the position, as he was considering buying G.W.'s book of business. (*Id.* at 74:20–75:11). In fact, Wells Fargo points out that Mr. Poppens sent an email in December 2021 in which he told a colleague that "[w]ith the advent of me declining the combined IN Market Leader role, my title will change to 'Senior Financial Advisory Manager.'" (ECF 55-9 at 52). Additionally, Mr. Poppens puts forward no evidence to support the contention that Wells Fargo policy required him to be considered for the new Market Leader role. Without any evidence that Mr. Poppens was "rejected for the position," he has failed to make out a prima facie case. *Riley*, 829 F.3d at 892.

Because Mr. Poppens neither argues, nor puts forward "direct or circumstantial evidence" of, intentional discrimination regarding his failure-to-promote claim, and he has not made out a prima facie case of discrimination, Wells Fargo is entitled to summary judgment on Mr. Poppens's failure-to-promote claim. *Id.* at 891.

*ii. Termination*

Wells Fargo next seeks summary judgment because Mr. Poppens has failed to make out a prima facie case for race discrimination regarding his termination. In support, it argues that Mr. Poppens cannot show any similarly situated individuals outside Mr. Poppens's protected class who were treated more favorably, and that Mr. Poppens cannot show that Wells Fargo's reasons for terminating him were pretextual. In response, Mr. Poppens argues that a jury could reasonably find that the reasons Wells Fargo gave for terminating him were pretextual because Wells Fargo changed those reasons over time, the Wells Fargo investigation of Mr. Poppens was a sham, and enough "bits and pieces" of record evidence exist to permit an inference of discriminatory intent. (ECF 63 at 10).

As with failure to promote, there is more than one path that Mr. Poppens can take to prove his claim that he was terminated for discriminatory reasons. First, the traditional *McDonnell Douglas* burden-shifting framework is available, under which he "must show that he is a member of a protected class, who was meeting the defendant's legitimate expectations, that he suffered an adverse employment action, and that similarly situated employees who were not members of his protected class were treated more favorably." *Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023) (internal citation omitted). If he makes this showing, the burden shifts to Wells Fargo to "set forth a legitimate nondiscriminatory reason for the adverse employment action." *Id.* at 507–08 (internal citation omitted). But ultimately, any "tests or rubrics for viewing discrimination claims" are just paths to "the only question that matters: when looking at

12

the evidence as a whole, whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 994 (7th Cir. 2024) (quoting *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Wells Fargo argues that the *McDonnell Douglas* path is closed to Mr. Poppens because he has failed to allege that "similarly situated employees who were not members of his protected class were treated more favorably." *Bowen*, 77 F.4th at 507. Though Mr. Poppens argues that Gerry Berg and Byran Palonis, two other older white Wells Fargo employees, were also discriminated against based on race, Mr. Berg and Mr. Palonis cannot serve as comparators to Mr. Poppens because, like Mr. Poppens, they are both white. *See Johnson v. City of Chicago Bd. of Educ.*, 142 F. Supp. 3d 675, 691 (N.D. Ill. 2015) (citing *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005)) ("For claims of racial discrimination . . . the proposed comparator cannot be someone of the same race."). Mr. Berg and Mr. Palonis are, at best, evidence of unfavorable treatment of people in Mr. Poppens's protected class. This is not enough to make out a prima facie case of discrimination under *McDonnell Douglas*.

Mr. Poppens does not contest this. But he does argue that he has put forward sufficient circumstantial evidence to show that Wells Fargo's reasons for firing Mr. Poppens were pretextual. If Wells Fargo's reasons for firing Mr. Poppens were pretextual, Mr. Poppens contends that a jury could reasonably infer from the record that the real reasons for his termination were discriminatory.

If an employer's explanation for an adverse employment outcome is not persuasive, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). But "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* (internal quotation omitted). A plaintiff may show pretext by establishing that "1) the proffered reasons are factually baseless; 2) the proffered reasons were not the actual motivation [for the decision]; or 3) the proffered reasons were insufficient to motivate [the adverse employment decision]." *Grube v. Lau Inds., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) (first alteration in original) (internal quotation omitted). But merely showing that Wells Fargo gave a false explanation of its reasons for terminating Mr. Poppens is not enough. To prevail on this approach, Mr. Poppens must show both that Wells Fargo's reasons were false and that there is enough evidence in the record for a reasonable jury to infer that they were pretext for discriminatory intent. *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025).

First, Mr. Poppens attempts to show that Wells Fargo's reasons were false by arguing that Wells Fargo's reasons for his termination have changed over time. He first alleges that Wells Fargo was intentionally vague when he was terminated. Then he alleges that Mr. Coleman did not answer Mr. Poppens when Mr. Poppens repeatedly asked why he was being terminated. Next, he alleges that a Wells Fargo attorney told Mr. Poppens he was terminated for "failure to meet expectations regarding the supervision of a direct report." (ECF 63 at 7). Then, he points to the U-5 Form, in which

14

Wells Fargo stated that Mr. Poppens was discharged for failure to meet expectations "in connection with managerial oversight in relation to the conduct of a direct report and in relation to interactions and communications with others." (*Id.*). Lastly, he highlights Wells Fargo's position statement to the EEOC, in which Wells Fargo stated that Mr. Poppens was terminated for "1) illicitly disclosing details concerning a confidential HR investigation into a direct report and 2) for failing to discipline a direct report and stop harassment." (*Id.*) Now, Mr. Poppens argues that Wells Fargo has changed its story again in its motion for summary judgment, adding even more reasons he was discharged by listing the specific findings of the internal investigation. (*Id.*)

As Wells Fargo points out, this is not so much a change over time as a trend of increasing detail. Even taking Mr. Poppens's allegations as true, he has identified no inconsistencies or contradictions in Wells Fargo's reasons. To "permit an inference of mendacity" from changes over time in an employer's reasons, "the explanations must actually be shifting and inconsistent." *Schuster v. Lucent Techs. Inc.*, 327 F.3d 569, 577 (7th Cir. 2003); *see also Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994). It is not enough that Wells Fargo did not provide every detail to Mr. Poppens when he was terminated, or that it added more detail over time, or that its internal investigation contained more factual details than it shared elsewhere. To show falsity, there must be some inconsistency; the reasons must have actually changed over time. Here, they did not.

Next, Mr. Poppens attempts to show that Wells Fargo's reasons were false because the Wells Fargo investigation conducted by Mr. Kramer was a "sham." (ECF 63 at 8). "In a typical sham investigation, persons conducting the investigation fabricate,

ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses)." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). To show the investigation was a sham, Mr. Poppens makes four principal arguments: (1) Mr. Kramer never told Mr. Poppens that Mr. Poppens was under investigation; (2) Mr. Kramer was told that he could not be the investigator on Mr. Poppens's case, but he remained on the investigation anyway; (3) Mr. Kramer only interviewed 7 employees out of the 35–40 employees who worked at the Fort Wayne Branch, and (4) Wells Fargo found severe and significant deficiencies in Mr. Kramer's report. Wells Fargo responds by arguing that these points either do not suggest a sham investigation or are themselves unsupported by the evidence.

First, Mr. Poppens argues that he was never told he was under investigation. But he puts forward no evidence to show that this was inappropriate or a violation of any policy. In fact, Mr. Poppens himself cites Mr. Kramer's deposition for the proposition that withholding documentation of the investigation from Mr. Poppens was standard Wells Fargo policy. (ECF 65-6 at 34:4–15). This does not suggest that Wells Fargo put a thumb on the scale for Mr. Poppens's termination; if anything, it suggests that this aspect of the investigation was normal and by-the-book. This argument fails.

Second, Mr. Poppens argues that Mr. Kramer inappropriately remained on the investigation. But as Wells Fargo points out, this is not supported by the evidence. Mr. Poppens's argument is based on an email from Wendy Thomason, a Wells Fargo employee, to Mr. Kramer. Mr. Poppens describes that email as Ms. Thomason telling

16

Mr. Kramer to connect with a new investigator on Mr. Poppens's case because Mr. Kramer was not permitted to be the investigator. (ECF 63 at 8). In fact, the email actually reads as follows:

> Below is how you would open the new case. I wouldn't go into all of your case history, I would just suggest the new investigator connect with you. **If the reported party in your current case is the one making the new allegations, you cannot be the investigator. I am unsure who the new reporting and reported parties are in the "new" case and how they relate to your current case.**

(ECF 65-6 at 112 (emphasis added)). It is undisputed that the reported party in Mr. Kramer's first investigation was G.W. And the evidence clearly shows that the reporting parties in Mr. Poppens's investigation were two different employees: Emily Rowe and Michael Jenkins. (ECF 55-9 at 84).[2] Thus, the reported party in Mr. Kramer's current case was G.W., and the parties making new allegations were Ms. Rowe and Mr. Jenkins. To contend this email forbids Mr. Kramer from investigating Mr. Poppens strains the bounds of good faith, and Mr. Poppens cites no other evidence in support of his point. This argument fails.

Third, Mr. Poppens argues that Mr. Kramer only interviewed 7 employees out of 35–40 employees working at the Branch. This does not suggest on its own that Mr. Kramer "deliberately fail[ed] to interview certain witnesses" in a manner suggestive of

---

[2] Though Mr. Poppens purports to dispute this, he offers no argument or evidence to the contrary in his brief or in his response to Wells Fargo's statement of material facts. The Court notes that Mr. Poppens responded to many of Wells Fargo's statements of material fact not by disputing the facts with citation to the record but by repeating the same blanket and nonspecific assertion that the investigation was a sham.

a sham investigation, and Mr. Poppens offers no evidence or argument for who else Mr. Kramer should have interviewed. *Harden*, 799 F.3d at 864. This argument fails.

Fourth, Mr. Poppens argues that the Wells Fargo Enterprise Investigation Monitoring and Review ("EIMR") team found "severe and significant deficiencies" in Mr. Kramer's investigation. (ECF 63 at 9). But the evidence Mr. Poppens cites for this consist of emails between Mr. Kramer, EIMR, and Ms. Thomason where EIMR checks Mr. Kramer's report and directs him to fix errors and omissions, then Mr. Kramer passes the report along to Ms. Thomason with those corrections made. (ECF 65-6 at 123–27). This is clear from Mr. Kramer's forward to Ms. Thomason, in which he reports back that various corrections, including spelling errors, have been implemented. (ECF 65-6 at 123). And even if these were not merely draft corrections before finalization, Mr. Poppens does not point to, and the Court does not see, any notes from EIMR that would suggest Mr. Kramer engaged in a sham investigation.

Without demonstrating the falsity of Wells Fargo's reasons for his termination, Mr. Poppens's claim cannot survive. But even if he had successfully shown falsity, there is still insufficient evidence in the record to permit an inference of discriminatory intent.

Direct evidence is not necessary to permit an inference of discriminatory intent. A plaintiff may cobble together a combination of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces of evidence from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). But when reviewing this collection of "bits and pieces," the question for

18

the Court remains the same: whether "the evidence as a whole . . . would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Li*, 110 F.4th at 994 (quoting *Ortiz*, 834 F.3d at 765).

Mr. Poppens contends that there are sufficient "bits and pieces" in the record to permit a jury to reasonably infer discriminatory intent. In support, he points to three categories: (1) evidence that Wells Fargo did not adhere to its typical investigation protocol when it came to Mr. Poppens's investigation, (2) evidence that Mr. Caldwell-Meeks did not adhere to typical Wells Fargo procedures when it came to Mr. Poppens and his older white counterpart, Gerry Berg, and (3) evidence that Mr. Caldwell-Meeks and Mr. Coleman discriminated against older white employees. Wells Fargo argues that in each case the evidence does not support Mr. Poppens's argument.

First, Mr. Poppens points to emails from Mr. Caldwell-Meeks to Mr. Kramer seeking updates on the investigation into Mr. Poppens as evidence that Wells Fargo did not adhere to its typical investigation protocol. Mr. Kramer testified in his deposition that generally he would not provide a lot of information or "share the intimate details" of investigations with the business side of Wells Fargo. (ECF 65-6 at 24:15–25:25). In Mr. Poppens's case, Mr. Caldwell-Meeks emailed Mr. Kramer asking for updates. (ECF 65-6 at 98). But the actual content of those emails does not suggest any improper influence of any kind, let alone improper influence born of racial discrimination. As Mr. Poppens points out, Mr. Caldwell-Meeks does ask Mr. Kramer to provide his opinion on Mr. Poppens's leadership, but immediately prior to that, in the same email, Mr.

19

Caldwell-Meeks writes that he looks forward to "discussing this matter in detail when you have completed your investigation." (ECF 65-6 at 104). It is evident from the emails that Mr. Caldwell-Meeks and others at Wells Fargo were eager for the resolution of the investigation, but there is no evidence in the record that they attempted to influence Mr. Kramer's investigation. Mr. Kramer testifies to as much in his deposition, stating that he did not permit the business side to "dictate how fast or slow" he went, and he reached his findings and conclusions independent of any communication with the business side. (ECF 68-1 at 84–85).[3] This argument fails.

Second, Mr. Poppens argues that Mr. Caldwell-Meeks did not adhere to typical Wells Fargo procedure when it came to Mr. Poppens and Mr. Berg, the Market Leader for Southern Indiana during the relevant time period. In support, he points to his own and Mr. Berg's declarations, in which they state that Rich Getzoff, the Wells Fargo divisional director, called them both and told them that the two markets would be merged and that one of the two of them would be selected. (ECF 65-2 ¶ 60). As discussed above, Mr. Poppens provides no evidence to support the existence of a Wells Fargo policy requiring existing leaders of merging markets to be considered exclusively for leadership of the new market. But even if such a policy existed, it is undisputed that Mr. Berg was on medical leave through 2023, and, as discussed above, Mr. Poppens informed coworkers that he would be declining the position. So the fact that neither of

---

[3] Because Mr. Poppens raises new arguments about Wells Fargo's treatment of the investigation in his response to Wells Fargo's motion, and introduces excerpts of Mr. Kramer's deposition in support, the Court will consider Mr. Kramer's entire deposition transcript, which Wells Fargo submitted alongside its reply brief. *See Central States, Southeast and Southwest Area Pension Fund v. White*, 258 F.3d 636, 640 n.2 (7th Cir. 2001).

20

them was interviewed for the position does not suggest any discriminatory animus on the part of Mr. Caldwell-Meeks. Furthermore, it is undisputed that Mr. Poppens never raised the new position with Mr. Caldwell-Meeks, nor applied for the position when it was posted.

Mr. Poppens also somewhat perfunctorily argues that the evidence supports an inference that Mr. Caldwell-Meeks treated him in a hostile manner. In support, he relies on his declaration statements that Mr. Caldwell-Meeks "grumbled" when Mr. Poppens asked about stepping down to a branch manager role and reacted with frustration when Mr. Poppens reported to him that Mr. Poppens had permitted G.W. to enter the Branch to clean out his office. (ECF 65-2 ¶¶ 93–129). These isolated conversations, one of which related to the reentry of an employee terminated after bringing weapons to the office, are insufficient to establish hostility. *Cf. Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 646 (7th Cir. 2005).

Lastly, Mr. Poppens argues that record evidence supports the inference that both Mr. Caldwell-Meeks and Mr. Coleman treated older white employees in a similar fashion. He points to the examples of Mr. Berg and Byran Palonis, the manager of the Merrilville branch, to support this argument. But as Wells Fargo points out, it is undisputed that Mr. Berg retired from Wells Fargo in 2023. And while Mr. Palonis was terminated, Mr. Poppens offers no evidence to suggest his termination was a result of discrimination. These cases are "insufficiently similar to those of [Mr. Poppens] to create an inference of discrimination that would preclude summary judgment." *Perry v. Bath & Body Works, LLC*, 993 F. Supp. 2d 883, 903 (N.D. Ind. 2014).

There is no genuine issue of material fact as to Mr. Poppens's race discrimination claim. Accordingly, his claim fails, and Wells Fargo is entitled to judgment as a matter of law.

### b. Age Discrimination

Wells Fargo also seeks summary judgment on Mr. Poppens's age discrimination claim. In support, it contends that Mr. Poppens has failed to make out a prima facie case for age discrimination, and that the record does not permit an inference of discrimination.

To support a prima facie case for age discrimination under the ADEA, a plaintiff must show that "(1) he was a member of the protected class (age 40 or over); (2) he was performing his job to his employer's legitimate expectations; (3) despite his performance, he was discharged, not hired or promoted, etc.; and (4) younger, similarly situated employees were treated more favorably." *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1028 (7th Cir. 1998). Wells Fargo argues that Mr. Coleman is not an appropriate comparator for more favorable treatment because Mr. Coleman was 54 at the time Wells Fargo posted the new Market Leader job, while Mr. Poppens was 63. Generally, no inference of age discrimination is appropriate if the employee bringing the claim is not replaced by someone "substantially younger (*i.e.* ten years or so)." *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740 (7th Cir. 2010). Furthermore, Mr. Caldwell-Meeks was 57 himself at the time the position was posted, making him a member of the class protected under the ADEA. (ECF 55-9 at 2). Though not dispositive, it is "significant" when "individuals alleged to have discriminated on the basis of age were themselves

members of the protected class." *Richter*, 142 F.3d at 1032. Without more, Mr. Poppens cannot make out a prima facie case of age discrimination.

Mr. Poppens does not contest this. Instead, he relies on the same arguments discussed above: an inference of discrimination is permissible because (1) the reasons for Mr. Poppens's termination have changed over time, (2) the investigation of Mr. Poppens was a sham, and (3) there are bits and pieces of evidence in the record that permit an inference of intentional discrimination. For the same reasons discussed above, those arguments fail.

### c. Defamation

Lastly, Wells Fargo seeks summary judgment on Mr. Poppens's defamation claim. In support, it argues that Wells Fargo's statements on the U-5 Form, the only statements alleged to be defamatory, are truthful, Mr. Poppens cannot establish malice, Wells Fargo's statements are protected by absolute or qualified privilege, and Mr. Poppens cannot establish defamation per se. Mr. Poppens confines his response to repeating his argument that Mr. Kramer's investigation was a sham, and arguing that he can establish defamation per se. As the Court determined above that there is no evidence to support the conclusion that the investigation was a sham, it will only address the defamation per se argument here.

To establish defamation under Indiana state law, which both parties agree governs here, a plaintiff must show the following things: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Ratcliff v. Barnes*, 750 N.E.2d 433, 436 (Ind. Ct. App. 2001). Whether a communication is defamatory is

23

generally a question of law. *Id.* It becomes a question of fact for the jury if the communication could reasonably be considered defamatory or non-defamatory. *Id.* Defamation per se is established if a communication imputes (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct. *Id.*

Mr. Poppens argues that Wells Fargo's statement on the U-5 Form was defamatory per se because it imputed misconduct in Mr. Poppens's capacity as a manager, and management was Mr. Poppens's trade. But as Wells Fargo points out, criticism of Mr. Poppens's capacity as a manager in a notice describing his termination is not enough for defamation per se. Defamation per se requires "a serious charge of incapacity or misconduct in words so obviously and naturally harmful that proof of their injurious character can be dispensed with." *Pierson v. Nat'l Inst. For Lab. Rels. Rsch.,* 319 F. Supp. 3d 1100, 1106 (N.D. Ind. 2018). Wells Fargo's U-5 Form statement that Mr. Poppens was discharged "after not meeting expectations in connection with managerial oversight" does not come near that high standard. This argument fails.

Because there are no genuine issues of material fact as to any of Mr. Poppens's claims, summary judgment is appropriate.

**IV.    CONCLUSION**

For these reasons, the Court **GRANTS** Wells Fargo's motion for summary judgment. (ECF 54). Because there are no defendants remaining, the Clerk is **DIRECTED** to close this case.

SO ORDERED on March 24, 2026.

_/s/Cristal C. Brisco_

CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT
